# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JENNIFER WOODS,

    **Plaintiff,**

    v.                                    **Case No. 19-CV-1586-SCD**

ANDREW M. SAUL,
**Commissioner of Social Security,**

    **Defendant.**

## DECISION AND ORDER

Jennifer Woods applied for Social Security benefits in 2016, alleging that she is disabled based on various physical and mental impairments. Following a hearing, an administrative law judge (ALJ) denied benefits in 2018, finding that Woods remained capable of working notwithstanding her impairments. Woods now seeks judicial review of that decision, arguing that the ALJ erred in evaluating the severity of her migraine headaches and weighing the opinions of two medical sources. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. I agree with the plaintiff that the ALJ committed reversible error in evaluating Woods's migraines and weighing the opinion of Woods's treating neurologist. Because these errors call into question the ALJ's findings at steps three through five, the decision denying Social Security benefits to Woods will be reversed and this matter will be remanded for further proceedings.

## BACKGROUND

Woods was born on July 19, 1972. R. 65.[1] As a young child, she was physically and sexually abused by her biological father. R. 406, 457, 459. Her parents divorced when she was six years old, and she has had no relationship with her father since then. R. 457, 459. Woods struggled in school—she suffered from mental-health issues, Asperger's syndrome, and a learning disability—but she was able to graduate. R. 457, 459–60. She got married at age twenty and subsequently gave birth to three children; the oldest two are diagnosed with autism. R. 457. The marriage ended in divorce after thirteen years. *Id.* In May 2009, Woods obtained a bachelor's degree in biology. R. 306, 411. Nevertheless, her employment history is relatively spotty: she has had long periods of unemployment, and between 2010 and 2016, she had at least eight short-term, part-time jobs, including as a cashier, a housekeeper, a prep cook, and a stocker. R. 406, 412, 606. She hasn't worked since July 1, 2016. R. 305.

In July 2016, Woods applied for disability insurance benefits and supplemental security income from the Social Security Administration (SSA), alleging that she became disabled on her last day of work (July 1, 2016), when she was forty-three years old. R. 13, 277–87. Woods asserted that she was unable to work due to the following medical conditions: autism/Asperger's, dyslexia, bipolar disorder, depression, anxiety, post-traumatic stress disorder, problems with short-term memory retention, socialization problems, sensory overload problems, and scoliosis. R. 309. After her applications were denied at the state-agency level, R. 102–71, Woods requested an administrative hearing before an ALJ, R. 207–08. Woods, along with her attorney, appeared via video before ALJ Brent Bedwell on September 20, 2018. R. 60–101.

---

[1] The transcript is filed on the docket at ECF No. 18-3 to ECF No. 18-16.

2

Woods testified that she is disabled and unable to work due to migraine headaches, a learning disability, dyslexia, pain in her back and hips, anxiety, and depression. R. 69–73. She indicated that, when she was working, her migraines caused her to miss at least five to seven days per month. R. 69. However, she had recently started having Botox injections, which she claimed reduced the frequency and severity of her headaches. R. 71–72. Woods stated, "I would say the frequency [has been reduced] by half, but I still get them at least once a week, but they're not as severe. They don't last three days except maybe twice a month, but they still last up to two days at least four times out of the month." R. 72. Woods further stated that she still had "singular" headaches "at least ten times" per month and that she had a headache at the time of the hearing. *Id.*

Catherine Anderson testified at the hearing as a vocational expert. *See* R. 80–99. Anderson indicated that Woods had only one past relevant job: a cashier, which was unskilled and performed at the light exertional level. R. 81. According to Anderson, a hypothetical person with Woods's age, education, and work experience could not perform the cashier job if she were limited to a restricted range of light work, but she could work as a mail clerk, a stock clerk, and an office clerk. R. 82–85. Anderson testified that all competitive employment would be precluded if that person required two unscheduled breaks per workday, each lasting about ten to fifteen minutes. R. 85–86. Similarly, Anderson indicated that employers would tolerate only one absence per month for someone doing unskilled work. R. 86.

Applying the standard five-step process, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), on December 17, 2018, the ALJ issued a written decision concluding that Woods was not disabled. *See* R. 10–35. The ALJ determined that Woods had not engaged in substantial gainful activity since July 1, 2016, her alleged onset date. R. 15. The ALJ found that Woods's

3

severe impairments—spine disorder, asthma, migraines, status post left distal third tibia and fibula open reduction internal fixation surgery, status post hardware removal and open reduction with internal fixation of the left distal tibia, ulnar neuropathy, obesity, anxiety disorder, depression, PTSD, and Asperger's—limited her ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 15–19.

The ALJ next determined that Woods had the residual functional capacity (RFC) to perform light work with the following additional limitations and allowances:

- She cannot climb ladders, ropes, or scaffolds;

- She can only occasionally climb ramps and stairs;

- She is limited to frequent handling and fingering with her non-dominant upper extremity;

- She must avoid exposure to irritants such as fumes, odors, dust, and gases; and

- She is limited to jobs that are unskilled, simple, and routine and that involve only occasional decision-making, change in work setting, and interaction with the public, co-workers, and supervisors.

R. 19. In assessing his RFC, the ALJ did not fully credit the severity of Woods's alleged symptoms. R. 19–25. As for the opinion evidence, the ALJ assigned "some weight" to the opinions of the reviewing state-agency psychological consultants; "little weight" to the opinion of Steven P. Kaplan, Ph.D.; "some weight" to the opinions of the reviewing state-agency medical consultants; and little weight to the opinion of Heather Stanko, MD. R. 25–27. The ALJ determined that, in light of the above RFC, Woods could not perform any past relevant work, but she could work as a mail clerk, a stock clerk, and an office clerk; therefore, she was not disabled. R. 27–29.

After the SSA's Appeals Council denied review, *see* R. 1–6, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502,

4

506 (7th Cir. 2016), Woods filed this action on October 29, 2019. ECF No. 1. The matter was reassigned to me in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 19, 20. The matter is fully briefed and ready for disposition. *See* ECF Nos. 23, 30, 33.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also

is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Woods contends the ALJ erred in evaluating the severity of her migraine headaches and weighing the opinions of two medical sources.

## I. Migraines

Woods first argues that the ALJ failed to consider whether her migraine headache impairment was medically equivalent to Listing 11.02 (epilepsy)[2] and failed to incorporate any limitations stemming from her migraines in the RFC assessment. *See* ECF No. 23 at 12–21; ECF No. 33 at 4–11.[3]

At step three, the ALJ must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926) (called "The Listings"). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595–96 (7th Cir. 2003); *Steele*, 290 F.3d at 940).

"For a claimant to qualify for benefits by showing that [her] unlisted impairment . . . is 'equivalent' to a listed impairment, [she] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *see also* 20 C.F.R. §§ 404.1526(b)(2), 416.926(b)(2) ("If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments."). Although there is no specific listing for primary headache disorder, the parties here agree that the SSA "has determined that the most analogous listing for evaluating

---

[2] Woods's brief actually cites the old listing for epilepsy, 11.03. The rule replacing Listing 11.03 with Listing 11.02 took effect on September 29, 2016, and applies to all applications, like Woods's, that were pending on or after that date. *See* Revised Medical Criteria for Evaluating Neurological Disorders, 81 Fed. Reg. 43048-01 (July 1, 2016) (codified at 20 C.F.R. Part 404, Subpart P, Appendix 1).

[3] All citations to Woods's briefs reflect the pagination provided by CM/ECF.

7

headaches is listing 11.02 (related to epilepsy)." *See* ECF No. 30 at 7–8 (citing *Pawlowicz v. Saul*, 19-cv-537-bbc, 2020 U.S. Dist. LEXIS 124551, at *14 (W.D. Wis. July 15, 2020)); *see also* ECF No. 23 at 14–16. "Listing 11.02(B) requires seizures (or in this case migraines) at least once a week for at least three consecutive months, despite adherence to prescribed treatment." *Pawlowicz*, 2020 U.S. Dist. LEXIS 124551, at *15 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02(B)). "Listing 11.02(D) requires seizures occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment, and a marked limitation in one of the following areas: (1) physical functioning; (2) understanding, remembering, or applying information; (3) interacting with others; (4) concentrating, persisting, or maintaining pace; or (5) adapting or managing oneself." *Pawlowicz*, 2020 U.S. Dist. LEXIS 124551, at *15–16. "'Despite adherence to prescribed treatment' means that you have taken medication(s) or followed other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months but your impairment continues to meet the other listing requirements despite this treatment." *Pawlowicz*, 2020 U.S. Dist. LEXIS 124551, at *6 (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.00(C)).

At step three, the ALJ here determined "that the evidence of record does not support a conclusion that any of the claimant's impairments, alone or in combination, meet or equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 16. The ALJ purportedly considered Woods's impairments under several listings, but he never discussed Listing 11.02. *See* R. 16. In fact, the ALJ did not mention Woods's migraines at all at step three. *See* R. 16–19.

The Commissioner argues that the ALJ's failure to expressly consider Listing 11.02 was harmless for three reasons. *First*, according to the Commissioner, the ALJ's discussion of

8

Woods's migraines elsewhere in the decision demonstrates that that impairment did not medically equal Listing 11.02 *See* ECF No. 30 at 9–17. When discussing Woods's subjective allegations, the ALJ noted that Woods claimed she was unable to work due, in part, to her migraines. R. 19–20. The ALJ further noted that Woods claimed on a headache questionnaire that she had headaches two times per week on average with light and sound sensitivity and occasional dizziness and vomiting. R. 20 (citing Ex. B7E [R. 352]).

The ALJ determined, however, that "[t]reatment records fail to support the severity of the claimant's alleged headaches." R. 23. In May 2016—a few months before her alleged onset date—Woods reported worsening headaches. R. 23 (citing Ex. B16F, pg. 7–8 [R. 623–24]). The ALJ noted that, despite this report, the neurological exam was normal, with "grossly intact motor and sensory modalities," and Woods walked "without any significant difficulty." *Id.* The following month, Woods reported headaches with vomiting. R. 23 (citing Ex. B7F, pg. 26–27 [R. 521–22]). The ALJ noted that the neurological exam showed no deficits, that Woods had sinus pressure during this appointment, and that Woods was prescribed medication for her headaches. *Id.* In July 2016—the same month she alleged onset of disability—Woods "told her provider that medication worked well for her and controlled her migraine symptoms." R. 23 (citing Ex. B7F, pg. 30 [R. 525]). The ALJ indicated that, "[l]ater that month, the claimant said that headaches typically lasted for about two hours." R. 23 (citing Ex. B7F, pg. 33 [R. 528]). In December 2016, another provider stated that Woods "had a nice improvement in the severity of her migraines" since starting Topiramate, so the provider continued with that medication. R. 23 (quoting Ex. B22F, pg. 20 [R. 771]). In January 2017, Woods had her first trigger-point injection. R. 23 (citing Ex. B26F, pg. 37 [R. 1087]). At her follow-up visit in February 2017, Woods reported improvement in her migraine

frequency with medication. R. 23 (citing Ex. B26F, pg. 38 [R. 1088]). Woods had trigger-point injections again in August 2017 and February 2018. R. 23 (citing Ex. 26F, pg. 46, 53 [R. 1096, 1103]). However, according to the ALJ, these injections provided only "limited relief," so Woods started Botox injections in May 2018. R. 23 (citing Ex. B26F, pg. 62 [R. 1112]).

The ALJ's evaluation of Woods's migraines when discussing her subjective allegations does not make up for the lacking medical-equivalence analysis at step three because that evaluation is not supported by substantial evidence. With respect to the treatment notes predating Woods's alleged onset date, the ALJ failed to explain why Woods's normal neurological exams undermined her alleged migraine symptoms. *See Wessel v. Colvin*, No. 4:14-CV-00055-SEB-DM, 2015 WL 5036775, at *6 (S.D. Ind. Aug. 4, 2015) ("the ALJ cited no expert opinion that the normal neurologic examinations meant that Ms. Wessel does not truly experience the number or severity of migraines she reported."); *Virden v. Colvin*, No. 14-CV-1219, 2015 WL 5598810, at *1 (C.D. Ill. Sept. 22, 2015) (physician "did not find 'significant abnormalities' during Plaintiff's neurological examination, and he suggested that she might suffer from migraine headaches.")

The ALJ also misrepresented several treatment records and omitted key information from others. For example, the ALJ erroneously claimed that Woods told her provider during a July 2016 visit that her migraine symptoms were controlled with medication. What Woods actually said was that her migraine frequency had *increased* over the past several months—from once per month to once per week—and that *in the past* Toradol had worked well for her and controlled her symptoms. R. 525. The ALJ then claimed that Woods reported her headaches lasted for about two hours at another visit "later that month." But the visit the ALJ cited happened in September, not later in July. *See* R. 528–29. More importantly, the ALJ

10

failed to mention that during that visit Woods complained about the increasing frequency of her migraines; Woods stated that, for the past month, she was getting a headache every one to three days, and each one lasted for about two hours. R. 528. Woods reported that her migraines were even worse two months later—two to four headaches per week, each lasting from several hours to up to three days, with light and sound sensitivity and some nausea and vomiting, R. 1081—but the ALJ didn't mention this visit.

Moreover, the ALJ appears to have overstated the effectiveness of Woods's migraine medications. The ALJ pointed to treatment records from July 2016, December 2016, and February 2017 that purportedly showed improvement with medication. Recall, however, that during the July 2016 visit Woods actually reported *increased* migraine frequency. R. 525. Although one provider noted in December 2016 that Woods had "nice improvement in the severity of her migraines," R. 771, that same month Woods told another provider that she was still having "frequent" migraines, R. 822. Similarly, despite reporting "significant improvement in her migraine frequency" in February 2017, Woods was still having weekly migraines. R. 1088. The record therefore shows that Woods continued to experience frequent migraines despite some limited relief from medications.

The ALJ also downplayed the lack of relief Woods reported following the last round of trigger-point injections in February 2018. *See* R. 1103. According to the ALJ, this injection provided "limited relief." R. 23. What the record really shows is that Woods continued to report having migraines throughout February, *see* R. 674, 885, and that in April 2018, she told her provider that "her migraines have not improved with the trigger point injections," R. 1104. At that time, Woods claimed to have "near daily headaches lasting between 4 and 6 hours with migraines 2–3 times per month lasting between 2–3 days each resulting in more than 15

11

headache days per month." R. 1104. The following month, Woods reported that her migraines were increasing in frequency: "At baseline she was having daily headaches lasting for about 4–6 hours with superimposed migraines 2–3 times per month lasting 2–3 days. Currently, she is having daily headaches across her forehead which nearly always transform into a full migraine if she doesn't treat early enough." R. 1109. Two weeks later, Woods went to the emergency room for a migraine that lasted three days and seemed different from "her normal migraines." R. 1342. The record therefore shows that, rather than having only limited relief from trigger-point injections, Woods's migraine symptoms actually increased significantly throughout 2018. Overall, the ALJ's evaluation of Woods's migraine symptoms lacks explanation and support in the record. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)).

*Second*, according to the Commissioner, Woods has failed to produce sufficient evidence showing that her migraines are equal in severity to all the criteria of Listing 11.02. *See* ECF No. 30 at 14–16. I disagree. To medically equal Listing 11.02(B), Woods had to demonstrate that she had a migraine headache at least once a week for three consecutive months despite adherence to prescribed treatment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02(B). Woods's reported symptoms throughout 2018 appear to meet these criteria. On January 30, 2018, Woods indicated that she was having three migraines per week. R. 1097. She continued to have migraines throughout February, *see* R. 674, 885, and on April 19, 2018, she reported having near daily headaches that lasted four to six hours and two to three migraines per month that lasted two to three days each, R. 1104. The following month, on May 23, 2018, Woods indicated that she was having daily headaches that almost always transformed into a full migraine. R. 1109. Two weeks later, on June 2, 2018, Woods went to

12

the emergency room because she had a migraine that lasted for three days. R. 1342. That's about where the medical records end, but at the administrative hearing on September 20, 2018, Woods testified that she was having at least one headache per week and that twice a month these headaches lasted three days and at least four times a month her headaches lasted up to two days. R. 71–72. There is no evidence that Woods was non-compliant with her migraine treatment during this period. Based on this evidence, I cannot say for certain that Woods's migraine headache impairment does not medically equal Listing 11.02(B).

*Finally*, the Commissioner maintains that the state-agency medical consultants' opinions constitute substantial evidence in support of the ALJ's step-three finding. *See* ECF No. 30 at 17–19. Again, I disagree. It's true that all the reviewing state-agency medical consultants opined that Woods did not have an impairment that met or medically equaled a listed impairment. *See* R. 110–11, 125–26, 141–45, 159–63. It's also true that the ALJ assigned some weight to these opinions. *See* R. 25, 26. But simply adding those two facts together doesn't result in a step-three determination that is supported by substantial evidence. The ALJ did not cite the state-agency opinions when evaluating Woods's impairments at step three, none of the state-agency consultants considered Woods's migraine headache impairment under Listing 11.02, and the state-agency consultants rendered their opinions *before* Woods's alleged worsening migraine symptoms. Thus, these opinions cannot save the ALJ's deficient step-three analysis.

In sum, the ALJ erred when he failed to consider whether Woods's migraine headache impairment was medically equivalent to Listing 11.02; that error was not harmless.

## II. Medical source opinions

Next, Woods argues that the ALJ erred in weighing the medical opinions of Dr. Stanko, her treating neurologist, and Dr. Kaplan, an examining psychologist.

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. *See* §§ 404.1527(c), 416.927(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

### A. Dr. Stanko

Dr. Stanko, a specialist in neurology, began treating Woods in November 2016. *See* R. 335, 610, 1080–83. In June 2018, Dr. Stanko submitted a Headaches Medical Source Statement in support of Woods's disability claim. *See* R. 393–99, 610–13. At that time, Dr. Stanko had seen Woods at least six times. *See* R. 1080, 1087, 1091, 1097, 1104, 1109. Dr. Stanko indicated that Woods had seven headaches per week, or thirty headaches per month,

14

and that a typical headache lasted four to six hours. R. 610–11. According to Dr. Stanko, Woods would likely be "off task" twenty-five percent or more at work and would likely be absent more than four days per month as a result of her migraine symptoms or treatment. R. 612–13.

The ALJ assigned little weight to the opinions contained in the Headaches Medical Source Statement, finding them inconsistent with the record. R. 27. According to the ALJ, Dr. Stanko's opinions about absenteeism and off-task behavior were inconsistent with her own treatment records. *Id.* The ALJ further determined that Dr. Stanko's opinion regarding the frequency of Woods's migraines was inconsistent with Woods's reports to "multiple treatment providers that her headaches improved with medication." *Id.* (citing Ex. B7F, pg. 30 [R. 525]; Ex. B22F, pg. 20 [R. 771]). The ALJ also noted that, "[a]lthough the trigger point injections were less effective more recently, the claimant also started Botox treatment." R. 27. With respect to the severity of Woods's migraines, the ALJ determined that Dr. Stanko's opinion was not supported by treatment records; "[f]or example, in July 2016, the claimant said that her headaches generally lasted for only two hours." *Id.* (citing Ex. B7/F, pg. 33 [R. 528]). "Given these inconsistencies," the ALJ concluded that Dr. Stanko's opinions "appear[ed] to be based on the claimant's subjective reports." R. 27.

Woods argues that the ALJ failed to give good reasons for rejecting Dr. Stanko's opinion and didn't weigh her opinion according to the regulatory checklist. *See* ECF No. 23 at 21–24; ECF No. 33 at 12–13. I agree. Dr. Stanko is a specialist in neurology who had an extensive treatment relationship with Woods. Given these facts, "the checklist required the administrative law judge to give great weight to [Dr. Stanko's] evidence unless it was seriously

15

flawed." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).

The ALJ did not point to any evidence showing that Dr. Stanko's opinion was seriously flawed. The ALJ did not cite any records to support his claim that Dr. Stanko's opinion about absenteeism and off-task behavior were inconsistent with her own treatment records. The ALJ also misrepresented the record and overstated the effectiveness of Woods's improvement with medication. One of the records the ALJ cited to support this conclusion—from July 2016, before Dr. Stanko began treating Woods—actually indicated that Woods's migraines were increasing in frequency at the time and that Toradol had helped control her symptoms in the past. R. 525. In the other record cited, it was Woods's treatment provider, not Woods herself, who stated that Woods had improvement in the severity of her migraines since starting Topiramate. R. 771. At any rate, that comment was made in December 2016—that is, well before Woods's alleged worsening migraine symptoms. The treatment records contemporaneous with Dr. Stanko's opinion were consistent with her opinion that Wood had daily migraines. *See* R. 1104, 1109. The ALJ also downplayed the lack of effectiveness of Woods's most recent trigger-point injection, *see* R. 1104, and mentioned Woods's recent Botox injections without any discussion of their effectiveness. Woods testified that the Botox injections had reduced the frequency of her migraines "by half," but she was still having weekly headaches. *See* R. 71–72. The record the ALJ cited concerning the severity of Woods's migraines was also outdated. Treatment records from April and May 2018—i.e., within two months of Dr. Stanko's opinion—indicate that Woods's migraines lasted four to six hours. *See* R. 1104, 1106. That is exactly what Dr. Stanko wrote on the Headaches Medical Source Statement.

In sum, the ALJ committed reversible error when weighing Dr. Stanko's opinion.

**B. Dr. Kaplan**

In 2010, Woods was referred to Dr. Kaplan by the Wisconsin Division of Vocational Rehabilitation for a psychological evaluation. *See* R. 411. After interviewing Woods and making a series of behavioral observations, Dr. Kaplan authored a written report in which he opined that Woods was incapable of full-time employment. *See* R. 411–17. The ALJ assigned this opinion little weight, finding it inconsistent with the record. *See* R. 25–26.

In 2017, Woods saw Dr. Kaplan "for an evaluation of her capacity to work for substantial wages on an ongoing basis." *See* R. 606–08. Dr. Kaplan concluded in his written report that Woods was "unable to tolerate stress, interact appropriately with peers and supervisors, problem solve, deal with normal changes in routine, or stay on task at vocationally competitive levels of efficiency." R. 607–08. Dr. Kaplan further concluded that Woods was "not capable of receiving criticism or correction of any type, without experiencing significant anxiety and loss of focus," that Woods "would need frequent breaks from any repetitive tasks," and that Woods "would certainly miss work at a minimum of 4–5 times per month." R. 608.

The ALJ assigned little weight to Dr. Kaplan's 2017 opinion for three reasons. *See* R. 26. First, according to the ALJ, Dr. Kaplan's opinion was inconsistent with Woods's treatment record. As an example, the ALJ noted that Dr. Kaplan characterized Woods's hygiene as "marginal at best," but Woods consistently was appropriately dressed and groomed during her mental-status examinations. R. 26 (citing Ex. B24F, pg. 6, 7 [R. 880, 881]; Ex. B21F, pg. 19, 2 [R. 701, 684]; Ex. B31F, pg. 36 [R. 1351]). Second, the ALJ observed that Dr. Kaplan did not appear to have "completed even a mini mental status examination with questioning

17

to determine the claimant's cognitive abilities." R. 26. Finally, in the ALJ's view, Dr. Kaplan's opinion was inconsistent with treatment notes from the relevant period, which showed that Woods was independent and, despite sometimes having an abnormal mood, "generally appropriate." *Id.* (citing Ex. B18F [R. 651–63]; Ex. B24F [R. 875–954]).

Woods argues that the ALJ failed to provide good reasons for rejecting Dr. Kaplan's 2017 opinion and "played doctor" when he determined that Dr. Kaplan's specific findings were inconsistent with Woods being independent and generally appropriate. *See* ECF No. 23 at 24–29; ECF No. 33 at 13–14. I largely agree. That Woods had marginal hygiene during her 2017 evaluation with Dr. Kaplan is inconsistent with treatment records describing Woods as appropriately dressed and groomed. But the fact that Woods apparently had a noticeable body odor and subpar dentition at the time of Dr. Kaplan's examination—she admitted to often forgetting to shower or brush her teeth, *see* R. 607–08—is not a good reason for rejecting Dr. Kaplan's specific opinions about Woods's ability to tolerate stress, interact appropriately with others, deal with stress, and stay on task. Similarly, the ALJ failed to explain how Dr. Kaplan's specific opinions were inconsistent with the record. Several of Dr. Kaplan's opinions concern Woods's ability to interact with others, so the fact she lived alone and didn't depend on help from others says little about her ability to perform in a normal work setting. Likewise, the ALJ didn't explain how Woods's "generally appropriate" behavior during her doctor visits was inconsistent with Dr. Kaplan's opinion that Woods would struggle with sustained work activity.

The ALJ's other reason for rejecting Dr. Kaplan's 2017 opinion—that there was no evidence he conducted his own mental-status examination—presents a closer call. Woods maintains that Dr. Kaplan's familiarity with her mental-health records and Dr. Kaplan's

18

behavioral observations make up for the lack of a mental-status exam. *See* ECF No. 23 at 27. In response, the Commissioner asserts that Dr. Kaplan's report shows he relied too heavily on Woods's subjective reports. I tend to favor the Commissioner on this point. By observing that Dr. Kaplan had not tested Woods's cognitive abilities, the ALJ was questioning the support for Dr. Kaplan's rather extreme opinions. That skepticism was well-founded given that Dr. Kaplan's conclusions largely repeated what Woods had told him without any further explanation or support in the record. *Compare* R. 606–07 ("Jennifer told me that she was unable to cope with the stressors that normally occur during a workday . . . [and] was unable to interact with the public, take direction from supervisors, or deal appropriately with her peers, without experiencing acute anxiety that often led to panic attacks.") *with* R. 608 (Dr. Kaplan concluding that Woods "is consistently unable to tolerate stress, interact appropriately with peers and supervisors, problem solve, deal with normal changes in routine, or stay on task at vocationally competitive levels of efficiency.").

If this were the only problem with the ALJ's decision, I may be hesitant to remand solely for a reevaluation of Dr. Kaplan's 2017 opinion. But given the issues identified above concerning Woods's migraine headaches and Dr. Stanko's opinion, on remand the ALJ should also more carefully scrutinize Dr. Kaplan's 2017 opinion.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ erred in evaluating the severity of Woods's migraine headaches and weighing the opinion of her treating neurologist. Based on this record, however, I cannot determine whether Woods was disabled as of July 1, 2016. Accordingly, it is necessary to remand this matter to the Commissioner.

The Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

     **SO ORDERED** this 16th day of October, 2020.

                             STEPHEN C. DRIES
                             United States Magistrate Judge